SOUTHERN CALIFORNIA EDISON
COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant
and Third–Party Plaintiff,

v.

(1) City of Los Angeles, Department of Water and Power, (2) Arizona Power Authority, (3) Colorado River Commission of Nevada, (4) Metropolitan Water District of Southern California, (5) City of Boulder City, Nevada, and the California cities of (6) Burbank, (7) Glendale, and (8) Pasadena, Third–Party Defendants.

Nos. 96–104 C, 96–103 C.

United States Court of Federal Claims.

Feb. 2, 1999.

Charles C. Thebaud, Jr. and Brad Fagg, Morgan, Lewis & Bockius, Washington, D.C., for plaintiff.

Franklin E. White, Jr. with whom were Assistant Attorney General Franklin W. Hunger, and Director David M. Cohen, Civil Division, Department of Justice, Washington, D.C., for defendant.

Michael N. McCarty, Brickfield, Burchette & Ritts, Washington, D.C., James P. Bartlett, representing Arizona Power Authority, James H. Davenport, Office of Attorney General, state of Nevada, Las Vegas, Nevada, representing Colorado River Commission of Nevada, Thomas C. Hoskinson, representing city of Los Angeles, Department of Water and Power, Jerome C. Muys, Diana Mahmud, representing Metropolitan Water District of Southern California, Bill Andrews, represent-

ing city of Boulder City, Nevada, William Sherman, Verner, Liipfert, Bernhard, McPherson & Hand, Washington, D.C., representing the California cities of Burbank, Glendale and Pasadena, Vivien C. Ide, representing city of Glendale, California, Terry B. Stevenson, representing city of Burbank, California and Scott Rasmussen, representing city of Pasadena, California, for third-party defendants.

## OPINION*

WIESE, Judge.

The question we address in this case is whether the Government correctly determined the refund amount due to plaintiff as its share of excess revenues collected from plaintiff and other public utility companies in connection with the sale of electricity at the Hoover Dam. The issue is now before us on cross-motions for summary judgment that have been fully briefed and argued by the parties. We conclude that the methodology employed by the Government in determining the amount of refund due plaintiff was contrary to the applicable regulations, and resulted in an incorrect distribution of the surplus revenues among all the contributing sources—the parties now before the court. Plaintiff is owed more than it received. Accordingly, we remand the matter for further proceedings consistent with the conclusions reached in this opinion.

## FACTS

### Statutory Background

On December 21, 1928, Congress enacted the Boulder Canyon Project Act, Pub.L. No. 70–642, 45 Stat. 1057 (codified as amended at 43 U.S.C. §§ 617–617v (1994)), which authorized and directed the Secretary of the Interior to "construct, operate and maintain [Hoover] dam and incidental works in the main stream of the Colorado River at Black Canyon or Boulder Canyon" where the river forms the boundary between Arizona and Nevada. 43 U.S.C. § 617. Section 4(b) of the Act required that before beginning con-

struction, the Secretary enter into contracts with various public and private utility companies to "insure payment of all expenses of operation and maintenance of said works incurred by the United States and the repayment, within fifty years from the date of the completion of said works, of all amounts advanced ... [by the Treasury] for such works, together with interest thereon....". 43 U.S.C. § 617c(b).

On July 19, 1940, Congress enacted the Boulder Canyon Project Adjustment Act ("Adjustment Act"), Pub.L. No. 76–756, 54 Stat. 774 (codified as amended at 43 U.S.C. §§ 618–618o ), for the purpose, among others, of modifying the method for amortizing the Government's investment in the project—now formally named the Hoover Dam. Section 1 of the Adjustment Act directed the Secretary to "promulgate charges, or the basis of computation thereof, for electrical energy generated at [Hoover] Dam during the period beginning June 1, 1937, and ending May 31, 1987, computed to be sufficient, together with other net revenues from the project," to, *inter alia*, (i) meet the operation, maintenance and replacement costs at Hoover Dam, and (ii) repay, within 50 years, project construction costs advanced from the Colorado River Dam Fund in the U.S. Treasury prior to June 1, 1937. The Adjustment Act also delegated to the Secretary the authority to promulgate such regulations and enter into such contracts as he might deem necessary or desirable to implement any of the provisions of the Adjustment Act or the Boulder Canyon Project Act. *See id.* § 618g.

### The 1941 Regulations

In 1941, the Secretary promulgated "General Regulations for Generation and Sale of Power in Accordance with the Boulder Canyon Project Adjustment Act" ("1941 Regulations"). Among other matters, these regulations set forth the basic principles which the Department of the Interior, Bureau of Reclamation (the Bureau) would be obliged to

---

* This is a consolidated action that brings together the separate claims of Southern California Edison (plaintiff in No. 96–104C) and Los Angeles Department of Water and Power (plaintiff in No. 96–103C). Also joined in this action as third-party defendants are other regional utilities (pub-

lic and private) that participated, along with Southern California Edison and Los Angeles Department of Water and Power, in the purchase of electrical energy from the Government under long-term contracts for the sale of hydroelectric power generated at the Hoover Dam.

follow in setting generating charges and energy rates for electric power generated at the Hoover Dam. Included in these regulations were the following provisions:

● *Article 6 —"Basis of Energy Rates."* The regulations required that rates be set such that revenues from the sale of hydroelectric power at the Hoover Dam would "be sufficient, but not more than sufficient," to cover, both on an annual basis and over the fifty-year contract period, the repayment with interest of the United States' investment in the Boulder Canyon Project. In addition, the rates were to be established so that the revenue would pay the costs of the project's operation and maintenance, and would establish a reserve for replacements and various other specified annual expenses.

● *Article 7 —"Uniformity of Energy Rates."* The regulations further required that rates for firm energy, as originally determined and as subsequently revised, "be uniform for all allottees of firm energy" and that rates for secondary energy, as originally determined and as subsequently revised, "be uniform for all users of secondary energy."

● *Article 8 —"Relationship Between Rates for Firm and Secondary Energy."* Under the regulations, the secondary energy rates were to be a fixed percentage of firm energy rates, represented by the equation: Secondary Energy = (.6363 ...) Firm Energy — .4, but not less than 0.2 mill per kilowatt-hour.

● *Article 14 —"Adjustment of Energy Rates."* The regulations provided that, in order to satisfy the revenue requirements of Article 6, power rates for firm and secondary energy were to be established at five-year intervals. Article 14(a). The rates were to be adjusted annually, either upward or downward, based upon actual annual expenditures and costs incurred. Article 14(b). Article 14(e) additionally required that as of June 1,

1987, the end of the fifty-year contract period, adjustments be made "through refunds or collections as the Secretary may find necessary to achieve consummation of the principle that the revenues shall be sufficient but not more than sufficient to provide the amounts set forth in Article 6 of these regulations...."

### The Contracts In Issue

Between May 29, 1941 and January 4, 1960, all the parties in this suit entered into contracts with the United States, retroactive to 1937 and extending through May 31, 1987, for the purchase of electrical energy from the Hoover Dam.[1] For all purposes relevant to this litigation, the contracts were identical, except that some contracts, including those of Southern California Edison ("SCE"), the Los Angeles Department of Water and Power ("LADWP") and the Metropolitan Water District of Southern California ("MWD"), contained language pertaining to the purchase of "secondary" energy—a term we define below. The contracts incorporated the terms and conditions of the 1941 Regulations, specifically noting that the contracts were "subject to all the terms and provisions of Exhibit 2 [the text of the regulations] hereof which is hereby made a part hereof as fully and completely as though set out herein at length...."[2]

### Firm and Secondary Energy

The contracts provided that SCE and LADWP would accept specified percentages of the total "firm" energy produced at the Hoover Dam each year, and in certain circumstances, would also have the option to accept and pay for portions of available "secondary" energy. Firm energy represented the amount of energy the Bureau expected to generate on a relatively reliable basis based on estimates of future Colorado River flows.

1. Southern California Edison, the Los Angeles Department of Water and Power, and third-party defendants Colorado River Commission of Nevada, the Metropolitan Water District of Southern California, and the California cities of Pasadena, Burbank, and Glendale, entered into contracts on May 29, 1941. Third-party defendants Arizona Power Authority entered into a contract on November 23, 1945, and city of Boulder City,

Nevada, entered into a contract on January 4, 1960.

2. In addition to these energy contracts, the United States had separate contracts with SCE and LADWP, designating them as the operating agents, through May 31, 1987, of the generating and associated electrical equipment located at the Hoover Dam's power plant.

Thus, firm energy was defined by the 1941 Regulations in specific terms: the first 4,330,000,000 kilowatt-hours of electricity that would be delivered at transmission voltage to the various power purchasers. The amount of specified firm energy was to decrease in each subsequent year by 8,760,000 kilowatt-hours. Firm energy was allocated among all the parties in this case in terms of specified entitlement percentages.

Secondary energy, on the other hand, was more dependent on the vicissitudes of the river's hydrology and thus its availability was more speculative. The regulations defined secondary energy as "electrical energy available in any year of operation in excess of the amount of firm energy." MWD had the first option to purchase secondary energy, with the balance made available for purchase by SCE and LADWP. For most of the contract period, SCE received 45 percent and LADWP received 55 percent of the secondary energy not used by MWD.

*Energy Assumptions and Rates*

The 1941 Regulations assumed, for purposes of computing energy rates, that approximately 205 billion kilowatt-hours of firm energy and 40 billion kilowatt-hours of secondary energy would be available for sale during the 50-year period ending May 31, 1987. Accordingly, for most of the contract period, rates were adjusted according to the total anticipated energy expected to be sold rather than on the basis of energy actually sold.

The output assumptions proved remarkably accurate during the first two decades of operation, but a dearth of secondary energy between 1954 and 1983—with no secondary energy at all produced in 25 of those 29 years—prevented actual energy levels from keeping pace with predicted totals. As a result, the Western Area Power Administra-

tion ("Western") [3] determined in 1982, as it approached the final five-year rate cycle of the 50-year contract term, that the originally estimated delivery of secondary energy would not be reached. By then only 17.5 billion of the estimated 40 billion kilowatt-hours (43.7%) had been produced. Western, therefore, altered its rate determination methodology from that point forward to base its secondary energy generation assumptions on the Bureau's hydrology projections for the remaining term of the contract.

*Secondary Energy Production in 1984–1987*

Fortuitously, between 1983 and 1987, rainfall and snowpack melt in the Colorado River basin were much higher than average, generating substantial amounts of secondary energy—nearly 19.8 billion kilowatt-hours—during the project's 1984–87 operating years. As a result, the revenue shortfall the Government faced at the beginning of operating year 1983 was transformed into a condition of substantial excess revenues during the last four years of the contract (1984–87). The Government was thus able to pay off its long-term debt obligations prior to 1987 and could in fact have avoided imposing any charges for energy distributed during the final year of the contract. However, Western and its customers agreed that it would be inappropriate, for a number of reasons, to charge a zero energy rate during the 1987 operating year. The contracting parties therefore decided to keep the 1986 operating-year rates in place for the final year of operation, and then distribute the excess revenues upon conclusion of the fifty-year term in accordance with the refund provisions of Article 14(e) of the regulations, *i.e.*, Exhibit 2 of the power purchase contracts.

*The Settling of Accounts*

On May 31, 1987, the contracts came to an end and thereafter Western retained a pri-

---

3. In 1977, as part of the Department of Energy Organization Act, Pub.L. No. 95–91, 91 Stat. 565 (codified at 42 U.S.C.A. §§ 7101–7382f (West 1995 & Supp.1998)), the Bureau of Reclamation's responsibility to market and establish rates for electrical energy generated at the Boulder Canyon Project was transferred to the United States Department of Energy, Western Area Power Administration ("Western"). 42 U.S.C.A. § 7152. However, the Bureau of Reclamation retained responsibility for operation and mainte-

nance of the Hoover Dam and for arranging for the repayment to the United States Treasury of the funds that were advanced for the construction, operation, and maintenance of the dam. Funds received from the sale of electrical energy marketed by Western are transferred monthly by Western to the Bureau for deposit in a special fund—the Colorado River Dam Fund—that was established in conjunction with the original legislation authorizing the Hoover Dam.

vate accounting firm to audit the project's 50–year operation. In November 1989, the auditor issued a report concluding that total revenues during the contract term exceeded operating expenses and debt service payments by $25,972,085. Approximately $22,835,693 of this amount was attributable to excess energy revenues, $1,585,372 was attributed to excess Dam and Appurtenances replacement reserves (D & A), and the remaining $1,551,020 was attributed to excess Generating Machinery and Equipment reserves (GM & E).

Between June 1987 and December 1989, Western met with the Bureau on numerous occasions to determine how to return the excess revenues to the contractors. A number of different methodologies for allocating distributions were given serious consideration. Western considered, but rejected, methods which took secondary energy revenues into account in the disbursement formula, including methods which looked at how much revenue each contractor had contributed over the entire contract term. Western ultimately decided to refund the excess revenues on the basis of the contractors' firm energy entitlement percentages as defined by Article 4(a) of the 1941 Regulations.

Meanwhile, project operations after 1987 began to experience serious cash-flow problems. A series of meetings was held in early 1990 with representatives of Western, the Bureau, and the Hoover power contractors. The main focus of those meetings was to prioritize necessary repairs and replacement work and to develop options for funding that work. A secondary topic of discussion was the disposition of excess revenues from pre–1987 operations.

Western provided attendees at a January 3, 1990 meeting with a handout detailing its proposed distribution of excess pre–1987 operating revenues. The handout, which was titled "Boulder Canyon Project, Overcollection of Funds 06/1/37–05/31/87," consisted of a one-page document that was included as part of a larger, nearly fifty-page package of otherwise unrelated materials. During the meeting, Harvey Boyce, Western's public utilities specialist, made the following statement, whose substance was reproduced in

the written materials provided to the attendees:

Please turn to the last page of the handout. This is a final accounting of the original 50–year contract period. The audit is complete and our staffs have agreed on the figures. You see the results on the last page. Western will now proceed to complete and forward to those original customers the final generating and determination of energy books.

The page to which Mr. Boyce referred listed each contractor's share of the total refund, and broke down the amount due each contractor into the amounts attributed to energy, D & A and GM & E. According to his affidavit, Mr. Boyce also recalls explaining to customer representatives at the January 3 meeting that the basis used to allocate the proposed refunds was the customers' defined firm energy percentages as set forth in the 1941 regulations.

At the January 3 meeting, a "repayment technical committee," composed of representatives of Western, the Bureau, and the Hoover power customers, was formed to address financial issues facing the project. The committee met on January 16 and again on February 21–22, 1990. At the January 16 meeting, a consensus developed that the surplus revenues from the earlier contract period should not be used to alleviate the current funding crisis, since the post–1987 contractors were not identical to the pre–'87 contractors, and the allocation percentages among holdover customers had changed in 1987.

At the February 21–22 meeting, Mr. Boyce, Western's representative, and Dale Imlay, the Bureau's Regional Financial Management Officer, addressed the committee concerning the refund of excess pre–1987 revenues. Mr. Boyce explained that the energy and D & A portions of the overcollection were to be refunded in accordance with the contractors' defined firm energy percentages, and that the contractors would soon receive rate booklets supporting Western's calculations. Mr. Imlay then polled representatives of each pre–1987 contractor, individually, as to whether they concurred with the refund and were ready to accept payment. All agreed to the proposed distribution scheme.

On March 9, 1990, Western mailed its customers a package of materials containing tables and data for the entire contract term supporting Western's calculations and proposed distributions. The cover letter noted:

> The individual booklets identify each Allottee's refund associated with each specific charge. There may be some slight deviations from those estimated amounts previously provided by Western Area Power Administration. Any deviation is the result of rounding in the final allocation of the total overpayment to the individual allottees.

> The Bureau ... is preparing the appropriate paperwork to effect the issuance of the refunds to the Allottees. You should be receiving your refund in the near future.

The first item in the package listed each contractor's share of the distribution relating to surplus energy revenues. Accompanying the list was an explanation stating that the distribution was allocated on the basis of "the amount of firm energy delivered to the allottees during O.Y. [operating year] 1987."

The Bureau paid distributions to all of the contractors, except SCE, by wire transfer or check on or about March 12, 1990. All of these contractors, including LADWP, accepted their payments without objecting or otherwise reserving the right to raise objection later.

In April 1990, Western notified SCE that its distribution would be offset by an amount which SCE owed to the Government for power purchases carried out under a separate contract involving another Government power facility. Consistent with this notice, SCE received a wire transfer in early July 1991, for the amount of its Hoover refund less the indicated offset. In late August of that year, SCE wrote to Western protesting this administrative offset. However, SCE did not raise any objection to the allocation of the Hoover surplus revenues, despite the fact that, by then, SCE had completed an internal audit of the original Hoover contract (a routine procedure following completion of a long-term project), which had raised questions concerning the way Western had allocated the excess revenues.

*The Beginning of the Dispute*

SCE's audit examination—which extended to and included financial records obtained from the Government—was completed in January 1991, seven months before its acceptance of payment from Western. Shortly after the completion of this audit, SCE met with LADWP, and then requested a meeting with Earl Hodge, the Assistant Area Manager for Power Marketing for Western, to discuss the audit findings and the refund methodology that Western had adopted.

A meeting was held on March 12, 1991, with representatives of Western, SCE and LADWP. During that meeting, SCE presented the conclusion of its auditors, who had taken the position that the refund methodology should have taken into account all revenues paid in over the term of the contract, including revenues from the sale of secondary energy. The meeting was primarily an information gathering session and did not amount to a formal demand for redistribution by SCE or LADWP. One of Western's participants mentioned, however, that if SCE intended to pursue a reallocation, the other original contractors needed to be notified of the problem since the distribution of excess revenues was a "zero sum game."

Following the meeting of March 12, 1991, SCE, LADWP and Western exchanged correspondence and met again on several other occasions in an effort to resolve their disagreement regarding the correct basis for allocation of the surplus funds. Nothing came of these efforts. Western remained committed to its view that distribution of the surplus according to each contractor's obligation with respect to firm energy purchases represented the fairest allocation scheme; SCE and LADWP, on the other hand, thought the distribution should be proportionate to each contractor's total energy purchases (both firm and secondary energy).

On January 6, 1995, Western invited the contractors and the Bureau to participate in a joint effort to resolve the refund methodology dispute. However, because Western had already distributed all available sums, a resolution of the dispute could be reached only if the contractors were to agree among themselves on some alternative refund allocation.

Western sought to facilitate a resolution acceptable to all, and suggested that, in the event a resolution of the issues could not be reached, it would encourage the contractors to seek binding arbitration. By letter dated February 15, 1995, the seven contractors (the third-party defendants here) jointly declined to participate in further meetings on the issue. Western, therefore, was compelled to end its settlement efforts. On June 15, 1995, Western informed SCE and LADWP of this decision and, at the same time, indicated that it would consider filing a declaratory judgment action in district court to obtain a ruling resolving the refund issue.

*Litigation Commences*

On February 14, 1996, the United States filed a complaint in the United States District Court for the District of Nevada seeking a judicial declaration upholding the reasonableness of the Government's interpretation of the regulations and the correctness of its resulting refund determinations. In that suit, SCE, LADWP, and the present third-party defendants were all joined. Six days later, on February 20, 1996, SCE and LADWP filed their respective complaints in this court.

Shortly after the commencement of litigation here, the Government moved to join as third-party defendants the other utility companies with whom it had contracted for the sale of Hoover Dam power. The premise of the Government's motion was that any monetary liability established against it in favor of SCE and LADWP would, in turn, constitute amounts incorrectly paid to the third-party defendants and, as such, would be recoverable by the Government under the provisions of the Contract Settlement Act, 41 U.S.C. § 114(b) (1994).

The third-party defendants opposed the Government's motion, contending that this court lacked subject matter jurisdiction to entertain the Government's contingent·claims against them. The matter was briefed and argued and a decision in the Government's favor was entered by this court on June 2, 1997. (The decision is reported at 38 Fed.Cl. 54.) Following the decision of this court, the United States District Court for the District of Nevada dismissed, without prejudice, the parallel action that had been pending there.

## DISCUSSION

*Preliminary Issues.*

■ We begin our discussion of this case by addressing the contention, raised here by the third-party defendants, that plaintiff's claim is untimely because it was not brought before this court until more than one year after Western's issuance of a final administrative decision on June 24, 1994, and therefore not before expiration of the one-year limitations period prescribed by 43 U.S.C. § 619(a)(h) (1994). Based on this contention of untimeliness, the third-party defendants ask that we dismiss plaintiff's claim for lack of subject matter jurisdiction.

Plaintiff opposes the motion to dismiss claiming, first of all, that the third-party defendants lack standing to raise the limitations issue and, second, that even if the limitations issue may be raised by the third-party defendants, the argument lacks merit. We disagree as to plaintiff's first argument but agree as to the second.

In support of its argument concerning standing, plaintiff relies on the decision in *Seaboard Surety Co. v. United States,* 144 Ct.Cl. 686, 1959 WL 7577 (1959), for the proposition that a third-party defendant may not raise here jurisdictional defenses that would go to defeat the plaintiff's claim against the Government. We think plaintiff overreads the case. The issue in *Seaboard* was whether the third-party defendant—an assignee bank—could compel the dismissal of the Government's cross-claim against it by claiming that the court lacked jurisdiction over the plaintiff's claim against the Government. In rejecting this argument, the court said that this claimed want of jurisdiction "is really no concern of the third-party defendant." *Id.* at 688. The court then went on to say that "if it should develop that, for want of jurisdiction, the court·dismisses the plaintiff's petition, there will of course be no occasion for the defendant to press its cross claim against the third-party defendant." *Id.*

We read these words to mean simply that the Government's right to bring the third-party defendant into the litigation in the first

instance may not be defeated by jurisdictional concerns that go to the merits of the plaintiff's suit against the Government. More than this was not intended. Indeed, as later decisions of the court reveal, a third-party defendant is empowered under our rules of practice and procedure to present its full defense to the plaintiff's claim. This point was explained in *Sun Shipbuilding & Dry Dock Co. v. United States,* 204 Ct.Cl. 915–16, 1974 WL 5642 (1974):

Under this court's third party statute (41 U.S.C. § 114(b)) and Rule 41 [the predecessor to current Rule 14], a third party defendant which becomes such pursuant to this type of notice is entitled to present its full defense to the plaintiff's claim. It is not restricted to assisting the defendant but may also "offer additional evidence on its own behalf and advance such legal contentions as it deems appropriate in the protection of its interest." *Bowser, Inc. v. United States and General Tank Co.,* 190 Ct.Cl. 441, 445–46, 420 F.2d 1057, 1060–1061 (1970). The theory of both statute and rule requires that the third party defendant be free to make its full defense to the plaintiff's claim, so that repetitious and piecemeal litigation be minimized to the greatest extent compatible with the limited jurisdiction this court has with respect to disputes between private parties. See *id.,* 190 Ct.Cl. at 445–47, 420 F.2d at 1060–61. It follows that third party, having been duly noticed in without objection and having become a party to the entire case, is free and competent to present any *defense* it wishes to both counts of the petition. At the same time, third party is not entitled to seek any affirmative judgment, either monetary or declaratory, against the plaintiff. *Rolls–Royce Ltd. v. United States,* 176 Ct.Cl. 694, 364 F.2d 415 (1966).

■ Having concluded that this court's procedure allows a third-party defendant to assert any defenses which the third-party has to the plaintiff's claim (including defenses assertable by the Government), we move on to the argument that plaintiff's claim is barred for lack of timeliness.

The limitations statute in question, 43 U.S.C. § 619a(h) (1994), enacted as section

105(h)(1) of the Hoover Power Plant Act of 1984, Pub.L. No. 98–381, 98 Stat. 1333, 1339, reads in pertinent part as follows:

Any claim that actions taken by any administrative agency of the United States violates any right under this subchapter or the Boulder Canyon Project Act [43 U.S.C. § 617 et seq.] or the Boulder Canyon Project Adjustment Act [43 U.S.C. § 618 et seq.] is barred unless suit asserting such claim is filed in a Federal court of competent jurisdiction within one year after final refusal of such agency to correct the action complained of.

The third-party defendants argue that plaintiff's claim is founded on the regulations issued under the Boulder Canyon Project Adjustment Act and is therefore a claim within the scope of the above-quoted statute which should have been raised—but was not—within one year after SCE's receipt of a June 24, 1994 letter from Western advising that it would not redistribute the pre–1987 excess revenues. Because Western's letter used the phrase "final administrative determination," the third-party defendants refer to this letter as the triggering point for the commencement of the one-year limitations period.

We do not think the limitations argument is well taken. An examination of the text of 43 U.S.C. § 619a makes evident that the purpose of the law was to prescribe the terms and conditions for the renewal of contracts for electrical energy generated at the Hoover Dam; *see* 43 U.S.C. § 619a(a), (g), and to settle disputes among various parties on those issues, for the period beginning June 1, 1987. *See* H.R.Rep. No. 98–684, at 10 (1984). In confirmation of this purpose, subsection (i) of the statute specifically declares that:

It is the purpose of subsection ... (h) [prescribing the one-year limitations period] ... to ensure that the rights of contractors for capacity and energy from the Boulder Canyon project for the period beginning June 1, 1987, and ending September 30, 2017, will vest with certainty and finality.

In light of this explicit declaration of purpose, it is fair to say that the text of section

619(a)(h) on which the third-party defendants rely (the "any claim" language quoted above) was intended only to reach those claims that concerned post–1987 contractor power allocations.

 The third-party defendants maintain, however, that quieting claims arising out of pre–1987 disputes is also within the scope of the statute. We would agree with that contention, but only to the extent that such pre–1987 disputes could be seen to have a factual or legal tie-in to a post–1987 power allocation issue. Our controversy, however, has no such tie-in to power allocation issues and therefore remains outside the one-year limitations period prescribed in section 619a(h). Accordingly, we reject the argument that plaintiff's claim must be dismissed for lack of timeliness.

*The Substance of the Dispute.*

 At the heart of defendant's case is the contention that the allocation scheme Western adopted for the distribution of the surplus operating revenues represented a reasonable solution to an issue not specifically addressed in the applicable regulations and, as such, reflects an interpretation of those regulations to which this court must defer. The argument draws upon the acknowledged rule that an agency's interpretation of its own regulations must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)). Defendant adds that this rule retains its validity even where, as here, the agency is discharging its administrative responsibilities within the framework of a contract with a private party. In support of this last point, defendant refers us to the decision in *National Fuel Gas Supply Corp. v. Federal Energy Regulatory Comm'n*, 811 F.2d 1563 (D.C.Cir.), *cert. denied*, 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987)—a case we discuss more fully below.

Plaintiff sees the case much differently. Describing its suit as one involving "a 'pure' breach of contract claim under the Tucker Act," plaintiff contends that "it is axiomatic" that such a claim is entitled to *de novo* consideration in this court. Specifically, what we encounter here, says plaintiff, is a question of contract interpretation. And such questions, it is further asserted, are traditionally seen as presenting issues of law that the courts are free to decide on their own. Plaintiff urges us to follow that conventional path.

In addition to the above argument, plaintiff also makes the point that even if the court were to subscribe to defendant's position regarding the deference ostensibly due to Western's decision, nevertheless, that decision fails the test of acceptability because, in plaintiff's view, it is fundamentally inconsistent with the underlying regulations that Western was obliged to follow. In a word, Western's allocation methodology is said to fail the test of reasonableness. We address these arguments below.

### A

 Considering, first of all, the question whether this court must defer to Western's allocation decision (assuming, for the moment, its reasonableness), we conclude such deference is appropriate. We are persuaded to that end by the reasoning set forth in *National Fuel Gas Supply Corp. v. Federal Energy Regulatory Comm'n*, 811 F.2d 1563 (D.C.Cir.), *cert. denied*, 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987)—a case on which defendant places chief reliance.

Among the issues considered in *National Fuel* of particular interest to us now was a question involving the Federal Energy Regulatory Commission's interpretation of a settlement agreement, entered into between National Fuel (the plaintiff in the suit) and its customers, that established the rates to be charged for natural gas. The settlement agreement, which had been approved in an Order entered by the Commission as part of a rate proceeding, was subsequently interpreted by the Commission as precluding certain retroactive price adjustments claimed by plaintiff. The question before the court was whether the Commission's interpretation of the settlement agreement was subject to a

deferential standard of review or, instead, could be examined by the court on a *de novo* basis.

The court concluded that the Commission's interpretation, even though it involved a question of law—*i.e.*, the proper construction of language—was entitled to deference. Several reasons were given for this conclusion, the most important being the change in law ushered in by the decision in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

In *Chevron*, the Supreme Court announced the rule that an agency's interpretation of the statute it is charged with administering is binding on the courts where that interpretation deals in a "reasonable" manner with issues which are not expressly or clearly addressed in the statute. 467 U.S. at 842–845, 104 S.Ct. 2778. *Chevron*, in other words, rejected the then-prevailing view that a court may freely review an agency's decision on pure questions of law.

In explaining this result, the court in *National Fuel* stated:

> The *Chevron* Court noted that Congress delegates to an agency the power to administer a congressionally created program. When Congress leaves gaps in the program, either explicitly by authorizing the agency to adopt implementing regulations, or implicitly by enacting an ambiguously worded provision that the agency must interpret, it has explicitly or implicitly delegated to the agency the power to fill those gaps. That delegation requires the courts to defer to an agency's decision about how to exercise its power.

811 F.2d at 1569.

Although the *Chevron* decision alone was thought sufficient to require judicial deference to the Commission's interpretation of the settlement agreement, the court in *National Fuel* went on to note that that result was also favored by an agency's greater expertise. The court explained:

As this court stated even before *Chevron*, "there is room, in review of administrative agencies, for some deference to their views even on matters of law like the meaning of contracts, as on the meaning of statutes, where the understanding of the documents involved is enhanced by technical knowledge of industry conditions and practices." *Columbia Gas Transmission Corp. v. FPC*, 530 F.2d 1056, 1059 (D.C.Cir.1976); *see also Gulf States Utilities Co. v. FPC*, 518 F.2d 450, 457 (D.C.Cir.1975) (deference is particularly appropriate where the question of interpretation is a technical one). Some courts have understood statements like this to imply that unless it is clear that the agency's interpretation rests on expert knowledge, no deference should be given. *See, e.g., Mid Louisiana Gas III*, 780 F.2d at 1243. We think that the better view, particularly in light of *Chevron*, is that deference should be given because the congressional grant of authority to the agency indicates that the agency's interpretation typically *will* be enhanced by technical knowledge.

811 F.2d at 1570.

Placing the foregoing considerations into the context of this case, we think it clear that Western's decision must be accepted, provided, of course, that it is reasonable. We come to this judgment because, in the present case—as later discussion will show—Congress did not speak to the specific question in controversy. That is to say, although the statute gives Western (and its predecessor, the Secretary) basic guidance as to the determination of charges for Hoover Dam power,[4] it provides no guidance whatsoever as to the disposition of revenues that may be collected in excess of the project's requirements during the initial 50 years of operation. Congress did, however, delegate to the agency considerable discretion to fashion regulations to implement the purposes of the legislation. *See* 43 U.S.C. § 618, § 618g. Pursuant to that authority, the Secretary promulgated the 1941 General Regulations governing the determination of energy and generation

---

4. The Adjustment Act directed the Secretary to "promulgate [energy] charges, or the basis of computation thereof," that are "sufficient" to meet the project's annual operation and mainte-nance expenses, to amortize the construction costs, with interest, within 50 years, and to provide certain additional revenues as specified in the statute. 43 U.S.C. § 618.

charges for Hoover Dam power, and those regulations were incorporated into and made part of every contract for the sale of Hoover Dam power during the term ending May 31, 1987. Given this statutory/regulatory structure, we deem this case to fall squarely within the dictates of *Chevron.*

Plaintiff, however, urges a different result. It points to the fact that on many occasions this court has expressed the view that the meaning of the terms of a contract presents an issue of law that is subject to *de novo* consideration. Although the cases plaintiff cites in support of this proposition do not squarely address the situation we deal with here—most, in fact, are of pre-*Chevron* vintage[5]—nevertheless the point being made is that the deference that may be owed to an agency's lawful exercise of its delegated authority should not extend to questions of contract interpretation that affect the very contract to which the agency is a party. The proper protection of contract rights, plaintiff maintains, requires judges that are free to decide for themselves.

The point is not an insignificant one. Indeed, in *National Fuel,* the court recognized that, if the agency itself were an interested party to the agreement, deference might be inappropriate because "deference might lead a court to endorse self-serving views that an agency might offer in a post hoc reinterpretation of its contract." 811 F.2d at 1571. The question that needs to be asked is whether this same concern should lead us to deny deference to Western's decision. We think not.

The most obvious reason for this conclusion is that Western had no economic stake in the excess revenue that was collected. The agency's sole function was to distribute the overcollections according to a system that could be seen as fair and reasonable by the purchasers of the Hoover Dam power. Self-interest could play no part in that function.

But, in addition to this immediate reason for accepting the integrity of the agency's decision, the point must also be made that in this case the agency came into its role as a contracting party, not by virtue of its own choice as to how best to discharge its assigned responsibilities, but by congressional direction. It was Congress that specified that the distribution of power from the Hoover Dam should be carried out by contract. ("Before any money is appropriated for the construction of said dam or power plant . . . the Secretary . . . shall make provisions for revenues by contract. . . ." 43 U.S.C. § 617c(b)). Hence, were we to adopt a blanket rule denying deference to agency decisions accomplished within the framework of a contract to which the agency is a party, the result in this case would be to shift the final management responsibility of a federal program from the administrative body designated by the Congress to the courts. *Chevron* forbids such a result.

## B

■■■ Having decided that, as a general rule, deference remains owing to an agency's interpretation of its own regulations even where the interpretation directly affects a contract to which the agency is a party, we

---

**5.** As to post-*Chevron* cases, principal reliance is placed on *United States v. Boeing Co.,* 802 F.2d 1390 (Fed.Cir.1986) and *San Carlos Irr. and Drainage Dist. v. United States,* 111 F.3d 1557 (Fed.Cir.1997). Neither case is helpful to plaintiff's position. *Boeing* involved an appeal from an independent adjudicatory tribunal—the Armed Services Board of Contract Appeals—and, in that context, questions of contract interpretation are always reexamined on a *de novo* basis. Our concern, however, is not with the correctness of an *adjudicatory* decision. Instead, we focus upon a question of contract interpretation as that question arises in the context of an agency's discharge of its on-going regulatory responsibilities. It is to the latter situation that *Chevron* is directed; not the former.

With respect to the *San Carlos* decision—a case involving a dispute over the meaning of a federal reclamation repayment contract—the court there, although reciting the general proposition that "interpretation of terms in a contract is an issue of law which we review de novo," 111 F.3d at 1564, went on to note that the Government's setting of power rates using "any rate other than the Parker–Davis rate was an abuse of discretion by the Secretary, even if deference is accorded to the Secretary under *Chevron.*" 111 F.3d at 1568. Given this reference to *Chevron,* we do not think plaintiff can legitimately invoke the *San Carlos* decision as a case in its favor.

come then to the second aspect of the problem: whether Western's refund allocation scheme is reasonable and therefore entitled to finality. We conclude that the allocation scheme should not be honored because it is inconsistent with the revenue adjustment concepts embodied in the regulations.

Western's decision to distribute the overcollections in accordance with each contracting party's energy purchase obligation begins with the fact that the regulations contained no detailed guidance on how overcollections, existing at the end of the contract term, were to be handled. The only regulation that has any immediate bearing on the point, Article 14(e), recites simply that "[a]s of June 1, 1987 [the contract termination date], adjustments shall be made, through refunds or collections as the Secretary may find necessary to achieve consummation of the principle that the revenues shall be sufficient but not more than sufficient to provide the amounts set forth in Article 6 of these regulations [the amounts necessary to meet the project's operation and maintenance costs; to establish a reserve for replacements; and to secure the repayment of the Federal investment with interest] .... "

To implement this language—which, in substance, directed that the Colorado River Dam Fund be reconciled to a zero balance—Western considered a number of alternatives with respect to distributing the $25.9 million overcollection. The concern was to find a methodology that would be seen as fair and equitable to all the contractors. Ultimately, it was decided that the excess revenues should be distributed based on each contractor's firm energy allocation percentages as defined in the regulations.

Several considerations brought about this result. First, and most importantly, Western took account of how revenue adjustments had historically been made and what action would have been taken if, in lieu of a revenue surplus existing at the end of the contract term, there existed instead a revenue shortfall. Based on the practice that had pre-

vailed throughout the 50–year history of the contracts, the expected solution to this hypothetical shortfall would have been an after-the-fact adjustment billed only to the firm energy customers. In other words, it was the firm energy customers who were seen to bear the financial risk of the enterprise.[6] Thus, in Western's judgment, it made sense to distribute the overcollections in proportion to the risks those customers had assumed.

A second reason that led Western to its allocation decision was its view that since the firm energy allocation percentages represented the only predictable measure of revenue flow throughout the 50–year contract period during which the yearly rate adjustments required by Article 14(a) were made, it necessarily followed—so Western thought—that the final adjustments to the revenue flow contemplated by Article 14(e) should affect only the mandatory contributants of that revenue.

The final reason supporting Western's allocation decision was its view that Article 14(e) referred to the adjustment of revenues (as opposed to the adjustment of rates) while the other sections of Article 14 contemplated only forward-looking rate adjustments. Thus, considered in its entirety, Article 14 was read as ruling out any refund methodology that was tied to the amount of revenue each contractor had contributed to the Colorado River Dam Fund over the 50 years. For these reasons then, Western chose to distribute the overcollections according to each contractor's energy allocation percentage—a percentage synonymous with each contractor's firm energy purchase obligation.

Plaintiff regards Western's allocation scheme as being fundamentally inconsistent with the rate-setting structure set out in the regulations. Two considerations in particular shape plaintiff's view. First, plaintiff points out that, pursuant to Article 8 of the regulations, the rates for firm and secondary energy were to be established according to a fixed and specified relationship between the two ("Secondary energy rate = Firm energy

---

6. Although revenues from estimated secondary energy sales were to be available to assist in providing revenues, there was no guarantee concerning the availability of secondary energy. In-

deed, in half of the 50 years of the contract period, there was no secondary energy and therefore no resulting revenues.

rate times 0.6363636 ........, minus 0.4; but not less than 0.2 mill per kilowatt-hour"); second, pursuant to Article 7 of the regulations, energy rates, for both firm and secondary energy, "shall be uniform for all users." Plaintiff's contention is that the rate determination methodology prescribed in these regulations offers the only permissible approach to the structuring of a refund formula. Hence, any refund formula that does not return to each of the energy purchasers its proportionate share of the overcollection in revenues would stand in violation of the regulations and therefore amount to a breach of contract. Plaintiff goes on to say that Western's allocation formula violated the regulations because that formula returned to the purchasers of firm energy funds that derived, in the main, from greater-than-anticipated sales of secondary energy during the final four years of the contract, 1984–1987.

We agree with the basic tenet upon which plaintiff structures its case: that the rate determination precepts set forth in the regulations are as applicable to the determination of a refund as they are to the fixing of rates in the first instance.

The regulations incorporated into plaintiff's contract required the Secretary to establish rates for firm and secondary energy that, when taken together, would provide revenue "sufficient, but not more than sufficient" to cover the costs of operation, maintenance and loan repayment (Article 6). In fulfillment of this objective, the regulations mandated that the rates for firm and secondary energy were to be maintained in accordance with a specific relationship (roughly stated, secondary energy rates were to be two-thirds of the firm energy rate minus 0.4). (Article 8). Further, as to each class of energy, the rates were to be "uniform for all allottees." (Article 7). Finally, the regulations directed that, at the end of the contract's 50–year term, "adjustments shall be made, through refunds or collections as the Secretary may find necessary to achieve consummation of the principle that the revenues shall be sufficient but not more than sufficient" to provide the amounts necessary to meet all specified revenue objectives. (Article 14(e)).

The last-quoted words are the focus of our concern. The Government maintains that those words draw an implicit distinction between adjustments to revenues and adjustments to rates because the closing adjustments contemplated by Article 14(e) focus only on "revenues." Pursuant to this reading then, the prescriptions pertaining to rates—the rate-structuring requirements of Articles 6 and 7—have no bearing upon how a closing-out refund or collection is to be determined.

The interpretation the Government espouses is not correct. Seen in context, Article 14(e)'s use of the term "adjustments" is an unambiguous reference to an adjustment in rates rather than simply to an adjustment in revenues. This point is evident, from the title of Article 14—"Adjustment of Energy Rates;" from the introductory language of Article 14—"Energy rates, both firm and secondary, will be adjusted either upward or downward by the Secretary at the intervals and for the purposes stated below;" and from the obvious conformance in word usage between this introductory text—"rates ... will be adjusted ... for the purposes stated below"—and the Article's subsequent paragraphs, including, of course, the adjustments of paragraph 14(e): "As of June 1, 1987, adjustments shall be made, through refunds or collections as the Secretary may find necessary to achieve consummation of the principle that the revenues shall be sufficient but not more than sufficient...."

With language this explicit, there is no room for interpretation: the closing-out of the contract to a zero balance was to be accomplished through a rate adjustment that, depending on the state of affairs, would either take the form of a refund or an additional collection. In either case, however, the contract-specified ground rules regarding rate structure would have to remain applicable, for the regulations recognized no exceptions to their application. In any final rate adjustment then, the relationship between firm and secondary energy rates had to be adhered to and the equality of pricing among the allottees would likewise remain an obligatory standard.

Western's methodology violated these requirements by authorizing a refund which returned all surplus dollars, irrespective of their source, to the firm energy allottees. By returning to the purchasers of firm energy funds that derived in substantial part from the purchasers of secondary energy, Western necessarily violated the requirement that secondary energy rates be set at a fixed percentage of firm energy rates. Western's refund decision was the product of an erroneous reading of Article 14—a reading that warrants no deference here because it ignores the meaning of plain language.

Nor can the other considerations which led Western to its choice of refund methods overcome the defect that exists here. Those considerations—the absence, in past practice, of retroactive rate adjustments; the obligatory character of the firm energy purchase requirement and the risks thereby implied; and the predictability of the firm energy purchase obligation—have no legal significance in determining how a final rate adjustment is to be implemented given that the regulations, correctly read, fully address the issue.

In light of the flaw in Western's methodology, does it follow then that plaintiff's position is correct? The answer is no. As noted, the core proposition on which plaintiff bases its case is the contention that the surplus revenues that arose in the closing years of the contract had to be returned to the allottees of the Hoover Dam power in proportion to their respective contributions to that surplus through purchases of firm and secondary energy. This much of plaintiff's position we endorse because its correctness follows of necessity from the requirements prescribed in the regulations for the setting of energy rates.

Where our difficulty with plaintiff's position comes in, however, is with the contention that the surplus is attributable to the energy sales—both firm energy and secondary energy—that occurred during the final four years of the contract, 1984–1987, and should, therefore, be distributed in proportion to each purchaser's contributions to such sales during those years. We do not see this as a contractually-defensible position. Granted,

the final four years of the contract were the years during which higher energy rates were in effect. That fact, however, has no bearing on the problem. Our concern in regard to the overcollection is not why it occurred, but when it occurred. It is only the issue of *when* that is important here because, by definition, an overcollection occurs only at the point when revenues exceed the "not more than sufficient" limitation specified for all authorized fiscal obligations as set forth in the regulations. That point was reached in mid–1986. Hence, contract revenues attributable to energy sales made after the project's books had been balanced represent the overcollection that the Secretary was contractually obliged to refund in accordance with the rate-setting standards, governing both firm and secondary energy, prescribed in Articles 6, 7, 8 and 14 of the regulations. Since there was no authority to keep the money, there was no authority to return it to other than the sources from which it came. Accordingly, Western must refund the surplus funds in proportion to each contractor's dollar contribution to that surplus as measured by energy purchases made after the audit-established date that the project books were determined to be in balance.

*Remaining Issues*

■ Defendant contends that, the merits of the controversy aside, plaintiff's acceptance of the refund without reservation and with knowledge that all funds had been distributed among the contracting parties, constitutes an accord and satisfaction of its claim against Western. Hence, from the Government's point of view, plaintiff has no remaining enforceable demand. The third-party defendants join in this argument but add, as further defenses, that plaintiff's claim also is barred by estoppel and by laches. We do not think the facts support any of these arguments.

An accord and satisfaction—we start with that—is the terminology that applies to a contract (the accord), between a debtor and a creditor, pursuant to which payment, in reduced amount, is made and accepted (the satisfaction) in discharge of an existing indebtedness that was unliquidated, matured, and disputed as to amount. Restatement

(Second) of Contracts § 281 cmt. d, illus. 6 (1979). "More specifically, it is only when there is a bona fide dispute as to the amount due or as to the debtor's liability that tender and acceptance of a lesser amount will result in an accord and satisfaction; provided, of course, there is a mutual understanding that the payment is in full satisfaction of the disputed claim." *Voight & McMakin Air Conditioning, Inc. v. Property Redevelopment Corp.*, 276 A.2d 239, 241 (D.C.1971).

■ We do not have an accord and satisfaction here. Plaintiff may indeed have accepted Western's refund check knowing that it authorized payment of a lesser amount than plaintiff thought correct. There are, however, no facts that would permit us to say that Western tendered the refund check with the intention that its acceptance by plaintiff become the end of the matter. Rather, the contrary is true. Western well understood that plaintiff thought the refund allocation scheme to be incorrect and it endeavored to resolve that dissatisfaction, initially through discussions with plaintiff and, later, by attempting to engage the third-party defendants in a reexamination of the problem. These post-payment efforts are plainly inconsistent with the notion that acceptance of the refund check signaled plaintiff's endorsement of a compromise in respect to the amount claimed to be due.

We move on now to the argument of the third-party defendants asserting that equitable considerations preclude plaintiff from pursuing its claim. Two related contentions are advanced—estoppel and laches—each a defense grounded on what the third-party defendants see as plaintiff's unreasonable delay in the pursuit of its claim. We deal with these defenses in turn.

■ The essence of estoppel is the inducement of another to act to his prejudice. Thus,

> the party claiming the estoppel must have relied on its adversary's conduct "in such a manner as to change his position for the worse," and that reliance must have been reasonable in that the party claiming the ` estoppel did not know nor should it have

known that its adversary's conduct was misleading.

*Heckler v. Community Health Servs., Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (footnote and citation omitted).

In support of their estoppel argument, the third-party defendants say that they were not made aware of plaintiff's dissatisfaction with the amount of its refund until March 1994—some three years after plaintiff had first raised the issue with Western—and by that late date, the argument continues, they had spent the refunds in furtherance of the needs and practices of their respective electric systems. Keeping in mind also that plaintiff had initially expressed its approval of Western's refund scheme, the third-party defendants go on to say that it would be inequitable now to require them to return funds they rightly viewed as theirs to spend. Thus, given plaintiff's initial approval of the refund distribution scheme and thereafter its lengthy delay in making known its concerns about the correctness of the distribution, the third-party defendants maintain that plaintiff is now estopped from any recovery.

■ The court does not accept this argument. Two concerns stand out. First, and most importantly, we think the argument is misdirected. Plaintiff was not in privity of contract with the third-party defendants nor had it any special relationship with them other than participating, through its own separate contract with Western, in a shared allocation of the operating costs and power output of the Hoover Dam. The central voice in this common enterprise belonged to Western; not to plaintiff. Hence, if there was a duty to speak and to alert the third-party defendants about plaintiff's dissatisfaction with the refund formula—and that, of course, is the essence of their argument—then that duty is assignable to Western; not to SCE.

The other concern we have about the estoppel argument goes to the question of whether the third-party defendants can legitimately claim that their expenditures of the surplus funds, and the possibility of having to restore those funds at a later date, constitute detrimental reliance of the sort on which an estoppel can be based. Although we need

not resolve this issue now, the problem we see is that the third-party defendants are attempting to retain funds to which, it may ultimately be determined, they had no entitlement in the first instance.[7] Under such circumstances, their claim of estoppel could find support only if requiring their return of the funds—should that be the final outcome of this litigation—would leave them significantly worse off than if they had not received the surplus funds in the first place.

Our conclusion in this regard follows from the decision earlier quoted—*Heckler v. Community Health Servs., Inc.,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). The plaintiff in *Heckler* was a health-care provider that attempted to invoke estoppel as a defense against the Government's efforts to recapture funds erroneously paid to plaintiff as a reimbursement of expenses some three years earlier. In rejecting the estoppel defense, the Court found plaintiff's reliance unreasonable (it had relied on the oral advice of the Government's fiscal intermediary in claiming the expense in question) and its alleged detrimental change of position unproven. On this latter point, the Court said:

> To analyze the nature of a private party's detrimental change in position, we must identify the manner in which reliance on the Government's misconduct has caused the private citizen to change his position for the worse. In this case the consequences of the Government's misconduct were not entirely adverse.

> Respondent did receive an immediate benefit as a result of the double reimbursement. Its detriment is the inability to retain money that it should never have received in the first place. Thus, this is not a case in which the respondent has lost any legal right, either vested or contingent, or suffered any adverse change in its status. When a private party is deprived of something to which it was entitled of right, it has surely suffered a detrimental change in its position. Here respondent lost no rights but merely was induced to do

something which could be corrected at a later time.

467 U.S. at 61–62, 104 S.Ct. 2218 (footnotes omitted).

The Court went on to say:

> There is no doubt that respondent will be adversely affected by the Government's recoupment of the funds that it has already spent. It will surely have to curtail its operations and may even be forced to seek relief from its debts through bankruptcy. However, there is no finding as to the extent of the likely curtailment in the volume of services provided by respondent, much less that respondent will reduce its activities below the level that obtained when it was first advised that the double reimbursement was proper.

*Id.* at 62, 104 S.Ct. 2218.

And, as its concluding point, the Court declared:

> Respondent cannot raise an estoppel without proving that it will be significantly worse off than if it had never obtained the CETA funds in question.

*Id.* at 63, 104 S.Ct. 2218.

In any further litigation between the Government and the third-party defendants, the concerns raised in *Heckler* will have to be addressed. For now, however, we decide only that estoppel is not a defense that the third-party defendants may raise against plaintiff. On the facts we have been given, it was Western that had the duty to speak, not plaintiff.

 Regarding the second equitable defense that the third-party defendants raise here—the defense of laches—this too we reject. Although the third-party defendants draw a distinction between laches and estoppel, in truth these defenses are much the same. Laches is a species of estoppel; it is identified with the denial of relief to one whose lack of diligence in the assertion of a right has operated to the prejudice of the party against whom that right is later asserted. "It is defined as neglect to assert a right

---

7. Although the third-party defendants are bound by our decision on the merits of plaintiff's claim against the Government, they retain the right to oppose any recoupment action the Government may later bring against them by raising any equitable defenses inherent in their separate contractual relationships with the Government.

or claim which, taken together with lapse of time and other circumstances causing prejudice to the adverse party, operates as bar in court of equity." *Kansas v. Colorado*, 514 U.S. 673, 687, 115 S.Ct. 1733, 131 L.Ed.2d 759 (1995) (quoting Black's Law Dictionary, 875 (6th ed.1990)).

The third-party defendants argue that the court should not allow plaintiff to press its claim here because plaintiff waited for approximately one year after all parties had assented to the refund allocation formula before contacting Western to request a meeting to discuss the company's audit findings. Particularly significant, assert the third-party defendants, is that the concerns which plaintiff raised at the meeting with Western—specifically its objection to a distribution system based solely on firm energy purchases—involved data that was always in plaintiff's possession. In substance then, the argument is that plaintiff had the wherewithal—and, hence the obligation—to have cast an informed vote when it originally supported Western's proposed refund methodology. Therefore, it should not be permitted belatedly to change its mind and challenge— to the third-party defendants' detriment— the distribution scheme to which it had earlier agreed.

The difficulty we have with this argument is that it minimizes, to a degree we are unwilling to accept, the importance of SCE's internal audit to the proper conduct of the corporation's affairs. The corporation's obligations to its shareholders and its ratepayers would seem to us to require the sort of audit that was done here, and not until such an audit had been completed could one reasonably have expected a corporate officer to give a binding approval to the Government's calculations.

While it may be true that plaintiff had access as early as January 1990 to all the facts on which it based its ultimate objection, we find it neither unreasonable nor impermissible for plaintiff to reserve action until it had before it its own final accounting. To conclude otherwise would be to impose on the deliberate process of corporate decision-making a requirement of uninformed haste. We cannot tolerate that result.

Accordingly, we reject the third-party defendant's equitable defenses and find that the doctrines of accord & satisfaction, estoppel and laches have no application to the present case.

### CONCLUSION **

Western's allocation scheme, though owed deference under *Chevron*, must nonetheless be overturned as an unreasonable, and hence impermissible, construction of the applicable regulations. The rate-making provisions of plaintiff's contract require that surplus funds—those collected after the repayment of the Boulder Dam Project in 1986—be returned in conformance with the rate-setting principles set forth in the regulations. A distribution scheme which ignores the contribution of secondary energy purchases to the surplus, necessarily violates the requirement that a fixed relationship be maintained between the firm and secondary energy rates. Such a decision was not within Western's discretion.

We therefore remand this action to Western for additional consideration consistent with this opinion.

---

** The conclusions set forth herein apply equally to Los Angeles Department of Water and Power, plaintiff in the consolidated action, No. 96–103 C.