**SOUTHERN CALIFORNIA EDISON COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant and Third–Party Plaintiff,**

v.

**(1) CITY OF LOS ANGELES, DEPARTMENT OF WATER AND POWER, (2) Arizona Power Authority, (3) Colorado River Commission of Nevada, (4) Metropolitan Water District of Southern California, (5) City of Boulder City, Nevada, and the California Cities of (6) Burbank, (7) Glendale, and (8) Pasadena, Third–Party Defendants.**

**Nos. 96–104 C, 96–103 C.**

United States Court of Federal Claims.

June 2, 1997.

Charles C. Thebaud, Jr. and Brad Fagg, Morgan, Lewis & Bockius, Washington, D.C., for plaintiff.

Franklin E. White. Jr. with whom were Assistant Attorney General Frank W. Hunger, and Director David M. Cohen, Civil Division, Department of Justice, Washington, D.C., for defendant.

Michael N. McCarty, Brickfield, Burchette & Ritts, Washington, D.C., James H. Davenport, Office of Attorney General, State of Nevada, Las Vegas, Nevada, representing Colorado River Commission of Nevada, Northcutt Ely, representing City of Los Angeles, Department of Water and Power, Diana Mahmud, representing Metropolitan Water District of Southern California, James P. Bartlett, representing Arizona Power Authority, Bill Andrews, representing City of Boulder City, Nevada, William Sherman, Verner, Liipfert, Bernhard, McPherson & Hand, Washington, D.C., representing the California Cities of Burbank, Glendale and Pasadena, Vivien C. Ide, representing City of Glendale, California, Terry B. Stevenson, representing City of Burbank, California and Scott Rasmussen, representing City of Pasadena, California, for third-party defendants.

ORDER DENYING THIRD–PARTY
DEFENDANTS' MOTION TO
DISMISS *

WIESE, Judge.

Plaintiff is a public utility power company that is suing here to recover part of the funds that it paid to the United States under a long-term contract—now concluded—for the purchase of electrical energy generated at the government's Hoover Dam facility in Boulder, Colorado. The essence of the claim is that the government has misread the contract's pricing provisions and consequently

---

* Consolidated with this action is the separate claim of City of Los Angeles, Department of Water and Power (No. 96–103 C). In that suit, Southern California Edison Company (the plaintiff here) has been joined as a third-party defendant.

failed to correctly compute the amount of rate refund due plaintiff upon completion of the contract in 1987.

The government denies liability. Additionally, however, the government has asserted contingent claims against—and now seeks to join as third-party defendants here—eight other public utility power companies, each of whom had entered into a long-term energy purchase contract with the United States incorporating provisions identical to plaintiff's own. The premise of the government's contingent claims is that any monetary liability determined against it in plaintiff's favor represents, in turn, an amount that was incorrectly paid to and distributed among the third-party defendants and consequently is a proper subject for recovery in this court under the provisions of the Contract Settlement Act, 41 U.S.C. § 114(b) (1994).

The case is now before the court on a motion by the third-party defendants to dismiss—for lack of subject matter jurisdiction—the government's contingent claims against them. The issue has been fully briefed by the parties and oral argument on the matter was heard May 13, 1997. We conclude that the government's contingent claims are properly assertable under 41 U.S.C. § 114(b).

I

On December 21, 1928, Congress enacted the Boulder Canyon Project Act, Pub.L. No. 70–642, 45 Stat. 1057 (codified as amended at 43 U.S.C. §§ 617–617v (1994)), which, among other things, authorized the Secretary of Interior to construct a water storage reservoir and hydro-electric facility on the Colorado River at Boulder Canyon, Colorado. The Act provided that, before any money was appropriated for construction of the dam, the Secretary was to enter into contracts providing for the future sale of electrical energy from the dam at rates sufficient to permit the government to recapture, over a fifty-year period, its initial investment in the dam as well as associated maintenance expenses and annual operating costs. *See* 43 U.S.C. §§ 617c(b), 617d.

On July 19, 1940, Congress enacted the Boulder Canyon Project Adjustment Act, Pub.L. No. 76–756, 54 Stat. 774 (codified as amended at 43 U.S.C. §§ 618–618p (1994)). This Act authorized and directed the Secretary to promulgate charges, or the basis for computing them, for the sale of electrical energy to be generated at the Boulder Canyon Project Dam—formally named the Hoover Dam—over the fifty-year period beginning June 1, 1937 and ending May 31, 1987. *See* 43 U.S.C. § 618.

Pursuant to this mandate, on May 20, 1941, the Secretary promulgated implementing regulations. *See* "General Regulations for Generation and Sale of Power in Accordance With the Boulder Canyon Project Adjustment Act," *reprinted in* Ray Lyman Wilbur & Northcutt Ely, *The Hoover Dam Documents*, H.R. Doc. No. 80717, at A279 (1948) [hereinafter "1941 Regulations"]. These regulations remained in effect until the expiration of the fifty-year period on May 31, 1987.

The 1941 Regulations set forth the basic principles with which the Department of Interior, Bureau of Reclamation had to comply in setting rates for electrical power generated at the Boulder Canyon Project. Specifically, the regulations provided that:

A. Rates shall be sufficient, but not more than sufficient, to cover annual costs of the Boulder Canyon Project and to pay for replacement costs, various specified expenses, and the United States' investment in the Boulder Canyon Project, including interest, over a fifty-year period beginning June 1, 1937.

B. Rates for firm energy shall be uniform for all allottees. Rates for secondary energy shall be uniform for all users of secondary energy.

C. The secondary energy rates must be a fixed percentage of the firm energy rates, but not less that 0.2 mill per kilowatt-hour.

D. As of June 1, 1987, at the end of the fifty-year contract period, necessary adjustments shall be made, through refunds or collections, to meet the requirement that the Boulder Canyon Project's revenues cover its annual costs. The revenues must also be sufficient to pay for replacement costs, other specified expenses, and the United States'

investment in the Boulder Canyon Project, including interest, over the fifty-year contract period.

On May 29, 1941, plaintiff, Southern California Edison Company ("SCE"), and the third-party defendants—the City of Los Angeles, Department of Water and Power; the Colorado River Commission of Nevada; the Metropolitan Water District of Southern California; and the California Cities of Pasadena, Burbank, and Glendale, entered into contracts with the United States, extending through May 31, 1987, for the purchase of electrical energy from the Boulder Canyon Project. Like contracts were also executed between the United States and third-party defendants Arizona Power Authority and City of Boulder City, Nevada, on November 23, 1945, and January 4, 1960, respectively. Taken together, these purchase contracts and the production of energy at the Hoover Dam to which they related were known as the Boulder Canyon Project. All of the contracts incorporated the terms and conditions of the 1941 Regulations and annexed them as an exhibit.

In 1977, as part of the Department of Energy Organization Act, Pub.L. No.95–91, 91 Stat. 565 (codified at 42 U.S.C. § 7101 et seq. (1994)), the Bureau of Reclamation's responsibility to market and establish rates for electrical energy generated at the Boulder Canyon Project was transferred to the United States Department of Energy, Western Area Power Administration ("Western").

On May 31, 1987, the fifty-year contract period for the Boulder Canyon Project came to an end. Thereafter, Western conducted a final accounting of the project as contemplated by Article 14(e) of the 1941 Regulations.

The final audit revealed that revenues collected under the project contracts had exceeded all required revenue needs by $25,-972,085. Accordingly, in early 1990, Western informed SCE and the other original power purchasers in the Boulder Canyon Project of the overcollection amount and also indicated that refunds would be forthcoming. On March 12, 1990, Western distributed refunds to SCE and the third-party defendants in the following amounts:

| | |
|---|---|
| Southern California Edison | 273,895.26 [1] |
| City of Los Angeles, Department of Water and Power | 4,314,342.89 |
| Arizona Power Authority | 4,560,352.11 |
| Colorado River Commission of Nevada | 4,540,289.18 |
| Metropolitan Water District of Southern California | 8,970,890.83 |
| City of Boulder City, Nevada | 656,629.29 |
| City of Burbank, California | 144,578.21 |
| City of Glendale, California | 462,960.41 |
| City of Pasadena, California | 396,863.80 |

Subsequent to distribution of the overcollection fund, a disagreement arose between SCE and Western as to how that fund should have been distributed among the contract purchasers. Whereas Western had distributed the fund in proportion to the amount each purchaser had contributed—measured, however, only by purchases made at so-called "firm" energy rates—SCE took the position that the fund should have been distributed in proportion to each user's total dollar contribution to the fund, according to the amounts paid the government both for firm energy purchases and "secondary" energy purchases.[2]

Despite serious efforts to resolve the issue, SCE and Western were unable to reconcile their conflicting interpretations of the regulations' refund requirements, thus prompting SCE to file suit here on February 20, 1996.[3]

1. The amount returned to SCE—$273,895.26—represents the difference between an originally calculated refund of $1,888,293.56 and a royalty payment of $1,614,398.30 allegedly due Western for generated power sold to SCE from another government power facility.

2. The 1941 Regulations define firm energy as 4,333,000,000 "kilowatt-hours delivered at transmission voltage" for the first year of operation of the dam. For each subsequent year, the amount defined as firm energy decreased by 8,760,000 kilowatt-hours. Secondary energy was defined by the regulations as "all electrical energy ... in

excess of the amount of firm energy." 1941 Regulations, supra, at § 3.

3. On February 14, 1996, four days prior to plaintiff's initiation of the instant suit, the United States filed a complaint in the United States District Court for the District of Nevada seeking a judicial declaration upholding the reasonableness of the government's interpretation of the regulations and the correctness of its resulting refund determinations. In that suit, Southern California Edison and the present third-party defendants were all joined as defendants.

On January 15, 1997, the district court conducted a telephonic hearing on a motion to dis-

The gist of SCE's complaint is that the Boulder Canyon Project contemplated a cost-based rate scheme—a scheme in which the refund of overcollections would, if correctly carried out, restore each participating power purchaser to the financial position it would have held had no overcollections occurred. Instead, the scheme that was adopted—according to SCE—was one in which surplus revenues (*i.e.*, overcollections) were returned, not to their contributing sources, but to other purchasers. In the words of the complaint: "Western effectively gave SCE's money away to third parties, *i.e.*, those other purchasers of only firm energy under the Boulder Canyon Project, whose payments had *not* caused the surplus." (emphasis in original). At bottom then, SCE's suit is one for breach of contract.

In its third-party complaint, filed here on April 16, 1996, the government leaves open the question whether its refund formula reflects a correct interpretation of the applicable regulations. Rather, the complaint recites only that "to whatever extent ... the United States may be required to pay SCE any part of the $3.050 million claimed in its complaint, the third party defendants were erroneously paid that sum by the United States [and][t]he United States is entitled to the repayment of any amounts erroneously paid to the third party defendants." The claim is asserted pursuant to Rules 14(a)(2) and 14(e) of the court's rules; jurisdiction, according to defendant, derives from 41 U.S.C. § 114 (1994).

## II

The third-party defendants have moved to dismiss the contingent claims brought against them. They rely on three grounds. First, they contend that the statute which the government invokes in support of our jurisdiction, 41 U.S.C. § 114(b), does not reach the factual situation encountered here. Second, they argue that the contingent claims raised in the government's third-party complaint may only be heard by a court established pursuant to Article III of the United States Constitution. Third, and last, they contend that the government's contingent claims were not filed within the six-year limitations period set forth in 25 U.S.C. § 2415(a) (1994) and are therefore time-barred. We do not accept any of these arguments.

This court's authority to permit and/or to require the joinder of third parties in a pending suit is set forth in 41 U.S.C. § 114(b). Among its several provisions, this statute grants the court authority "upon motion of the Attorney General, in any suit or proceeding where there may be any number of persons having possible interests therein, [to] notify such persons to appear and to assert and defend such interests." 41 U.S.C. § 114(b). The statute goes on to say that, upon the appearance of any person pursuant to a summons or notice from the court, the case as to such person shall, for all purposes, be treated as if an independent proceeding had been instituted by such person:

> except that the United States shall not be heard upon any counterclaims, claims for damages or other demands whatsoever against such person, other than claims and contingent claims for the recovery of money hereinafter paid by the United States in respect of the transaction or matter which constitutes the subject matter of such case, unless and until such person shall assert therein a claim, or an interest in a claim, against the United States....

*Id.*

The jurisdictional dispute that arises here centers on the meaning of the words quoted

---

miss that had been filed by defendants Colorado River Commission of Nevada, Arizona Power Authority, Metropolitan Water of Southern California, City of Boulder City, Nevada, and the California Cities of Burbank, Glendale and Pasadena.

Pursuant to this hearing, an order was entered by the district court on January 15, 1997, temporarily staying the action there to await the outcome of proceedings in this court. The district court's order goes on to grant the motion to dismiss "in the event the United States Court of Federal Claims certifies that it is lifting the stay, denying the motion to dismiss pending before that court, and will hear all respective claims so that complete relief can be afforded. Upon such certification by the Court of Federal Claims, this action shall be dismissed without prejudice." *United States v. Southern California Edison. et al.,* No. CV–S–96–00122–HDM (RLH) (D.Nev. Jan. 15, 1997) (order granting temporary stay and conditionally granting motion to dismiss).

immediately above. Specifically, the question is whether the contingent claims asserted by the United States come within the limitation prescribed by the statute—*i.e.,* whether or not they are contingent claims for money paid "in respect of the transaction or matter which constitutes the subject matter of [plaintiff's] case."

The third-party defendants insist that the statutory language does not embrace this case because the contingent claims, as they see them, bear no transactional nexus to plaintiff's contract with the government. It is pointed out that those claims, or more particularly, the contracts to which they relate, are not linked to plaintiff's contract in the sense of their being parts of a single endeavor as is the case, for example, in the government procurement context. In that setting, the several participating entities—contractor, bonding company, financing institution—are brought together through complementary privity relationships in furtherance of a single undertaking—the successful performance of a government contract. Such a common focus, the third-party defendants insist, is not present here: the contingent claims do not find their source in plaintiff's contract with the government but rather in the third-party defendants' own separate contracts with the government. Hence, the argument concludes, the contingent claims are not truly relatable to the transaction that plaintiff now brings before this court, and therefore those claims may not be made a part of this litigation.

In support of their view of the statute's correct application, the third-party defendants draw upon the decision in *Oliver–Finnie Co. v. United States,* 133 Ct.Cl. 555, 137 F.Supp. 719 (1956)—a case they describe as the most directly on point. In that case, plaintiff, the Oliver–Finnie Company, sued here for breach of contract claiming that the government was responsible for the contaminants found in some of the foodstuffs that were being supplied to it (the company) for repackaging into combat rations for the United States Army. The government denied liability and asserted that it was plaintiff's own mishandling of the furnished supplies that

was the source of the contamination. Additionally, the government sought to implead the several suppliers of the food items, each of whom had entered into a separate contract with the government for the manufacture and shipment of the foodstuffs to plaintiff. The question before the court was whether the court's third-party practice statute, 41 U.S.C. § 114(b), permitted compulsory joinder of the suppliers.

The court rejected the government's attempt to bring in the third parties. It held that 41 U.S.C. § 114(b) applies only where the interest being asserted, either by the third parties against the government or by the government against the third parties, "is derived through the contract or claim upon which the plaintiff instituted suit." 133 Ct. Cl. at 557, 137 F.Supp. at 721. In further explanation of this view, the court said:

> [W]e may not give the word 'interest' as it appears in this statute the broad meaning urged by the Government. Here the Government is not asserting its claims against these third parties through plaintiff's contract with it nor are the third parties making any claim against the Government either in respect to plaintiff's contract in which they have no interest or under their own contracts with the Government. Accordingly ... they are not proper parties in this case.

*Id.*

■ Relying on the foregoing language, the third-party defendants insist that in this case, as in *Oliver–Finnie,* the United States is not claiming against them under plaintiff's contract and the third-party defendants, in turn, are not claiming against the United States under either plaintiff's contract or their own contracts. Rather, they maintain, the contingent claims being asserted by the government against the third-party defendants arise under *their* contracts, not plaintiff's, and therefore, the argument concludes, do not involve the same subject matter as the pending suit.

Though their argument is well-presented, the court cannot subscribe to the position taken by the third-party defendants in regard to the scope of § 114(b). They interpret the language of the decision in *Oliver–*

*Finnie*—specifically the text that reads "derived through the contract or claim upon which the plaintiff instituted suit"—to mean essentially that, in order to be joinable here, a third-party defendant must have a direct pecuniary stake in the claim in suit. Short of that, the requisite "interest" that the statute speaks of is, in their view, missing.

This is too narrow an interpretation of the court's words. The quoted text should be read with the facts of the case in mind. Particularly, it should be noted that the claims which the government was asserting in *Oliver–Finnie* represented contingent demands for indemnification. That is to say, they were demands which, if the court were ever called upon to decide them, could well bring into play facts distinct from those bearing on the outcome of the plaintiff's demand against the government. It simply did not follow—as the premise of the government's contingent demands in *Oliver–Finnie* assumed—that facts that would render the government liable to the plaintiff would also be controlling in the government's claims against the third parties. The distinctiveness of the contracts involved there foreclosed the likelihood of such a possibility.

 It is this potential lack of factual commonality that should be seen as the shaping force of the *Oliver–Finnie* language. Consequently, where the claim and contingent claim hold out the possibility of requiring the adjudication of two different sets of facts, Section § 114(b) is not available to the government. The claims, even if related, simply do not satisfy the same subject matter standard required by the statute. Conversely, where the resolution of a single set of facts can be expected to be determinative of both claim and contingent claim, then it would be analytically correct to describe the contingent claim as one "derived through the contract or claim upon which the plaintiff instituted suit."

 The case now before the court fits within this latter category. At issue in plaintiff's claim against the government is the correctness of the interpretation of the rate regulations that were made part of plaintiff's contract. Since those same regulations were also part of the third-party defendants' contracts with the government, it necessarily follows that the outcome of plaintiff's suit—the interpretation of the regulations there reached—will likewise control the meaning of those regulations in the third-parties' contracts. This is so because there can be but one rule of interpretation for these regulations regardless of where they exist. The short of the matter then is this: if plaintiff prevails in its claim against the government, then the government, in turn, must prevail in its demands against the third parties, for we deal here with one pool of money that is to be distributed among all eligible participants according to one set of rules.[4] Given this setting, the claim of the United States clearly satisfies the jurisdictional criteria of 41 U.S.C. § 114(b).

 *Moving on to the second argument,* the third-party defendants contend that permitting the government to invoke Section § 114(b) to compel an adjudication of its claims against them in this court is constitutionally offensive in two respects. First, they argue, such a procedure permits an Article I tribunal (this court) to hear and decide issues which, in their view, may only be heard by an Article III court; second, they contend that the procedure deprives them of their rights under the Seventh Amendment to a jury determination of those issues.

These arguments are not new. Precisely the same contentions were raised in *United States v. Rush,* 804 F.2d 645 (Fed.Cir.1986), a case involving an appeal of a default judgment, entered in the government's favor, for

---

4. During the oral argument of this case, the third-party defendants expressed concern that certain equitable defenses, such as laches and estoppel, that would be available to them in a recoupment action brought by the United States in a district court would not be assertable against the United States in this court. The concern is not well-founded. Equitable defenses that form part of the substantive law of contracts may be raised here with the same force and effect such defenses would be accorded in a district court. "Where the relief is monetary, we can call upon such equitable concepts as rescission and reformation to help us reach the right result." *Quinault Allottee Ass'n v. United States,* 197 Ct.Cl. 134, 138 n. 1, 453 F.2d 1272, 1274 n. 1 (1972).

the recovery of contract funds mistakenly paid to the third-party defendant—a terminated government contractor. The appellate court rejected both contentions, holding, in substance, that the controversy involved public rights—that is, it arose "between the government and persons subject to its authority in connection with the performance of the constitutional functions of the executive and legislative branches and ... historically could have been determined exclusively by those branches." *Rush,* 804 F.2d at 647. In other words, *Rush* involved a situation "where the Government [was] involved in its sovereign capacity [acting] under an otherwise valid statute creating enforceable public rights." *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 51, 109 S.Ct. 2782, 2795, 106 L.Ed.2d 26 (1989) (quoting *Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n,* 430 U.S. 442, 458, 97 S.Ct. 1261, 1270, 51 L.Ed.2d 464 (1977)). Because no private right was involved, the Seventh Amendment's guarantee of a jury trial "in suits at common law" was not implicated. And, for the same reason, neither was that controversy one that could only be resolved by a court exercising Article III judicial power. Thus, the court of appeals saw no constitutional infirmities in the Section § 114(b) proceeding.

■ The third-party defendants urge the court to reexamine this issue. However, this is not the proper forum for that purpose. If the issue does warrant a second look, that is a reexamination only the court of appeals may undertake. So far as this court is concerned, it must accept the Rush decision as controlling precedent—a modern-day reaffirmation of the public rights doctrine first articulated by the Supreme Court over a century ago in *Murray's Lessee v. Hoboken Land & Improvement Co.,* 59 U.S. (18 How.) 272, 283, 15 L.Ed. 372 (1856). In that case, the Court, in considering issues not unlike those encountered here, noted that "there has been no period, since the establishment

of the English monarchy, when there has not been, by the law of the land, a summary method for the recovery of debts due to the crown." *Id.* at 277. Considered against this background,[5] Section § 114(b) transgresses no constitutionally preserved due process rights.

■ Turning to the final issue, the third-party defendants contend that, even if the government's contingent claims could be asserted under Section § 114(b), those claims now are time-barred. To support this contention, they refer to the provisions of 28 U.S.C. § 2415(a) (1994)—the statute which prescribes a six-year limitations period for "every action for money damages brought by the United States ... founded upon any contract express or implied in law or fact." Since the payments in question here (those made to the third-party defendants) occurred more than six years prior to the filing of the third-party complaint, the argument is that the government's demands against the third-party defendants are untimely.

The difficulty with this contention is that it runs afoul of a later paragraph of the same statute, § 2415(f), which declares that:

> The provisions of this section shall not prevent the assertion, in an action against the United States of any claim of the United States ... against an opposing party, a co-party, or a third party that arises out of the transaction or occurrence that is the subject matter of the opposing party's claim.

The third-party defendants attempt to side-step this provision of the statute by reasserting their initial argument—namely, that the government's claims against them do not arise out of the transaction or occurrence that is the subject matter of plaintiff's claim. Since the court has previously rejected this argument, its reassertion now can accomplish nothing: 28 U.S.C. § 2415(f) preserves the timeliness of the government's contingent claims against the third-party defendants.

---

5. The summary procedure under attack in *Murray's Lessee* arose under a statute that allowed the United States to recover, from a collector of federal revenue, remittances to the government that, upon audit of the collector's account, were found to be owing. The statute authorized the

issuance of a distress warrant by the Solicitor of the Treasury pursuant to which a United States marshal could seize and sell the personal property of the collector, and convey his real property, in satisfaction of the amounts claimed to be due the government.

## III

For the reasons stated, the court concludes that, under the authority of 41 U.S.C. § 114(b), the United States is authorized to join the third-party defendants in this action and to assert contingent claims against them.